IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 1, 2015

## STATE OF TENNESSEE v. ANTHONY BLAKE WISDOM

**Appeal from the Criminal Court for Davidson County
No. 2012-C-2245    Steve R. Dozier, Judge**

---

**No.  M2015-00099-CCA-R3-CD – Filed March 8, 2016**

---

The Defendant, Anthony Blake Wisdom, was convicted by a Davidson County Criminal Court jury of aggravated robbery, a Class B felony.  *See* T.C.A. § 39-13-402(a)(1) (2014).  The Defendant was sentenced as a Range II, multiple offender to fourteen years.  On appeal, the Defendant contends that the evidence is insufficient to support his conviction.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT L. HOLLOWAY, JR., JJ. joined.

Jay Umerly (on appeal) and Kyle Parks (at trial), Nashville, Tennessee, for the appellant, Anthony Blake Wisdom.

Herbert H. Slatery III, Attorney General and Reporter; Clarence E. Lutz, Senior Counsel;, Glenn Funk, District Attorney General; and J. Wesley King, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case arises from the robbery of an Iraqi immigrant who came to the United States in 2012, following three years of working with the United States Army in Iraq. The victim testified that he shared an apartment in Nashville with four roommates.  He stated that on May 16, 2012, he met Sarah Syres at the apartment complex laundromat. He said she asked to use his cell phone, he borrowed his roommate's phone, and Ms. Syres used the phone for a long time.  The victim said that he returned the phone to his roommate, and that Ms. Syres told the victim she was hungry.  He stated that they went to a friend's apartment, that Ms. Syres ate a salad, and that she asked him for twenty dollars because she was hungry.  The victim said that he gave her the money and that

she performed a sex act on him, although he did not remember the events immediately preceding the act. He stated Ms. Syres told him that she had to give a gift to an acquaintance and left.

The victim testified that the next day, he and one of his roommates were outside their apartment smoking cigarettes when Ms. Syres approached them. The victim said his roommate and Ms. Syres went inside to the roommate's bedroom, and when they emerged, Ms. Syres asked the roommate for transportation. The victim stated that he spoke to Ms. Syres for a few minutes before she left, that his roommate told the victim he would return, and that within an hour Ms. Syres returned to the apartment with two people with whom the victim was not acquainted.

The victim testified that when Ms. Syres returned, he saw Ms. Syres, a man, and another woman standing by the driver's side door of a white van. The victim said that he went inside and resumed an Internet video conversation with his family in Iraq. The victim stated that he had forgotten to lock the door and that the man and Ms. Syres walked into the apartment. The victim said Ms. Syres told the man that the victim's apartment was "the apartment" and that she knew the victim was alone in the apartment because she had been there earlier.

The victim testified that the man pulled out a small black pistol from his pocket. The victim said the man pointed the pistol at him, asked what the victim was doing, pushed the victim down, and pointed the pistol at the victim's head. The victim stated that Ms. Syres left the apartment but that the other woman, who was drunk and eating an ice cream cone, stayed. The victim said the man told the woman to pick up items to steal and that the woman put two laptop computers, the telephone, and a cell phone in a white bag. [1] The victim stated that the man threw him on the couch, put a knee on his chest, and pointed the gun at his head. The victim said that the man asked if the victim used illegal drugs and that the victim told him no. The victim said the man took a pack of cigarettes and the victim's wallet from his pockets, threw the victim's passport on the floor, and told the victim, "[G]et up, let's go." The victim stated that the man took $100 from the victim's wallet.

The victim testified that the man took him outside and that the victim's neighbor was in the hallway. The victim said that he was upset and crying, that he locked the apartment door, and that he asked the neighbor for help. The victim said that the man with the pistol ran away and that the neighbor chased the man. The victim stated that he saw the man and the second woman drive away in the white van, that the neighbor chased them in his truck, and that the neighbor's truck struck the van's rear bumper. The victim said that the police arrived three or four minutes later.

---

[1] One laptop computer and the cell phone belonged to the victim, the other computer belonged to a roommate.

The victim testified that he did not know the second woman and that she followed the man's order to collect the victim's belongings. The victim said that he spoke to Detective Charles McEachron and later identified the two women and the man in photograph lineups.

Copies of the three photograph lineups were received as exhibits. The victim testified that the first photograph he chose depicted the woman who put the computers and telephones in the bag and that the woman was later identified as Kira Bukowski. The victim said that the second photograph he chose depicted Sarah Syres. The victim stated that the third photograph he chose depicted the man who robbed him and that he identified the man as the Defendant. The victim said that neither the Defendant nor Ms. Bukowski had permission to be in his apartment.

The victim testified that relative to his sexual encounter with Ms. Syres, he was unaccustomed to American culture and did not know how to begin a romantic relationship. He thought he and Ms. Syres could be friends and progress into a romantic relationship. He denied paying for sex previously. The victim said that prostitution was illegal in Iraq, that he did not think prostitution was "okay" in America, and that the twenty dollars he gave Ms. Syres had nothing to do with sex.

The victim testified that when he saw Ms. Syres on May 17, he did not know she and his roommate were going to the roommate's bedroom to have sex. The victim stated that Ms. Syres spoke to him and indicated she would return to the apartment complex later in the day. He said that on May 16, Ms. Syres asked him for twenty dollars but that he only had a $100 bill. The victim stated that he obtained smaller bills from his roommate.

The victim testified that when Ms. Bukowski took his computer, he and his mother had been video chatting online. He said that Ms. Bukowski did not take the computer charger. He stated that Ms. Syres did not enter the apartment and that after telling the Defendant and Ms. Bukowski, "this is the apartment," she walked away. The victim said that he believed Ms. Bukowski was drunk because she was "going left and right . . . laughing and eating ice cream, smiling, and [the Defendant] had the pistol to my head." The victim agreed that the Defendant did not take the computers but said that the Defendant told Ms. Bukowski to take them. The victim said that the Defendant put the gun in his pocket when he saw the neighbor.

Metro Nashville Police Detective Charles McEachron testified that on May 17, 2012, he responded to an armed robbery call. He said that after speaking with officers at the scene, he spoke with the victim. Detective McEachron stated that the victim told him that the victim had forgotten to lock the apartment door and that upon exiting the apartment's bathroom, he saw two women and one man standing inside the apartment. The victim told him that the man grabbed him, asked for drugs and money, went

-3-

through the victim's pockets, and removed a pack of cigarettes and a tube of lip balm. The victim said that the man threw him face down onto a couch and placed a gun to the back of his head. The victim told Detective McEachron that he noticed other individuals taking property from the apartment and running out the door.

Detective McEachron testified that after speaking to the victim, he spoke to a witness and searched for the suspects' van. He said that another officer located a white Chrysler minivan without a license plate about four-tenths of one mile from the apartment complex. Detective McEachron stated that upon arriving at the van's location, he saw damage to the left rear bumper and that the van's appearance was consistent with information he had received. Detective McEachron said that no suspects were at the scene but that witnesses said they saw people running away from the van and removing the license plate.

Detective McEachron testified that he called the identification unit to process the van's exterior. He said he returned to the apartment complex and investigated further and later returned to the police station to determine the identity of the van's owner, the people inside the van, and a woman known to the victim as "Sarah." Detective McEachron said that he searched the van's vehicle identification number (VIN) and that the van was registered to Patricia Bukowski. He said that the license plate number of the fleeing van provided by witnesses at the apartment complex was one character different from the number found during his VIN search. Detective McEachron said that upon searching previous vehicle incidents, he learned that Patricia Bukowski lived with Kira Bukowski and that Kira Bukowski matched the description of one of the women involved in the robbery.

Detective McEachron testified that he constructed a photograph lineup which included Kira Bukowski, but the victim did not identify Ms. Bukowski with certainty. Detective McEachron stated that on May 23, 2012, he received the latent fingerprint analysis report, which identified Ms. Syres's and the Defendant's fingerprints on the van. Detective McEachron compiled two photograph lineups with Ms. Syres's and the Defendant's pictures and showed them to the victim. Detective McEachron said that the victim identified Sarah Syres and the Defendant.

On cross-examination, Detective McEachron testified that initially, the victim did not mention having a video conversation with his family when the robbery occurred and that Detective McEachron thought the victim was not being completely honest with him. Detective McEachron said that when he showed the victim the second photograph lineup, the victim told him that he and Ms. Syres had sexual contact and that the victim's roommate also had sexual contact with Ms. Syres. Detective McEachron said the victim admitted he exchanged twenty dollars for sexual favors.

Detective McEachron testified that he interviewed Ms. Syres and Ms. Bukowski. He said that Ms. Syres's and Ms. Bukowski's accounts differed and that neither account was consistent with the victim's account. Detective McEachron said Ms. Syres told him that she learned the victim had $100 when they were "making the deal" and that she and Ms. Bukowski went to the victim's apartment to discuss arranging another sexual transaction before the robbery.

Detective McEachron testified that he saw an unplugged power cord for a computer lying on the victim's living room floor. He did not remember whether the victim mentioned his passport during the initial interview. Detective McEachron said the victim told him that the man who robbed him had touched the victim's wallet, but Detective McEachron did not remember if the wallet or passport had been analyzed for fingerprints. Detective McEachron stated that the computers were not recovered. He said that a gun had not been recovered and that the evidence of a gun being involved came from the victim's statement and Ms. Syres's and Ms. Bukowski's interviews.

Kira Lynn Bukowski testified that she had pending an aggravated robbery charge in connection with this case. She said that on July 10, 2013, she signed an immunity agreement and that she did not have any other agreement with the State in exchange for her testimony. The agreement was received as an exhibit. It specified that a statement given on July 10, 2013, would not be used as evidence against Ms. Bukowski unless her testimony under oath differed materially from the statement.

Ms. Bukowski testified that on May 17, 2012, Ms. Syres called Ms. Bukowski asking for a ride to a "date." Ms. Bukowski said that Ms. Syres worked as a prostitute and that Ms. Syres expected to be paid $100 for the date. Ms. Bukowski stated that the Defendant drove them to the apartment complex in Ms. Bukowski's mother's van and that the Defendant insisted Ms. Bukowski accompany Ms. Syres to the date to "hurry it up a little." Ms. Bukowski said Ms. Syres knocked on the apartment door, and when the victim opened the door, the Defendant suddenly came upstairs with a gun and pushed them all into the apartment. Ms. Bukowski stated that she had not seen the Defendant with a gun prior to that moment.

Ms. Bukowski testified that Ms. Syres ran away and that Ms. Bukowski was "befuddled" with an ice cream cone in her hand. Ms. Bukowski said that the Defendant pushed the victim onto a couch and held down the victim. The Defendant pointed a gun at the victim's head and asked him, "[W]here is the money?" The Defendant told Ms. Bukowski to take two laptop computers and to go to the van. Ms. Bukowski said that she was shocked and afraid of the Defendant and that she took the computers and possibly a cell phone. Ms. Bukowski stated that she had never seen the victim before the incident.

Ms. Bukowski testified that she returned to the van and sat in the passenger seat until the Defendant returned. She said that the Defendant started the van and that the victim chased them. A large truck or sport utility vehicle (SUV) started following them as they left the apartment complex. She said that they drove to an apartment complex on Tampa Drive, that the Defendant took the computers out of the van, and that she did not see them again. Ms. Bukowski stated that she and the Defendant went to a friend's apartment for ten or twenty minutes and left with other friends.

On cross-examination, Ms. Bukowski testified that she was not under oath when she gave her statement in connection with the immunity agreement, that the prosecutor told her to tell the truth, that she had previously been to prison, and that she did not wish to return. She said that in May 2012, she worked as a prostitute and cared for her mother and son and that she used cocaine, Lortab, Xanax, and alcohol. Ms. Bukowski stated that she met Ms. Syres in February or March 2012, that Ms. Syres also worked as a prostitute, and that Ms. Bukowski looked after Ms. Syres. Ms. Bukowski said that before the robbery, Ms. Syres had lived with her for three months and that the Defendant had lived with them for two weeks. Ms. Bukowski stated that Ms. Syres used cocaine.

Ms. Bukowski testified that on May 16, 2012, she and the Defendant picked up Ms. Syres from the victim's apartment complex. Ms. Bukowski said that on May 17, she drank six or seven malt liquor drinks and vodka, took at least three Lortab pills, one "bar" of Xanax, and some cocaine. She said that she and Defendant were together all day and that Ms. Syres went out earlier in the day. She said that when she and Ms. Syres knocked on the victim's door, the victim briefly discussed obtaining change for a $100 bill before the Defendant appeared. Ms. Bukowski stated that the Defendant "bum rushed" her and the victim into the apartment and unsuccessfully attempted to push Ms. Syres inside, as well.

Ms. Bukowski did not remember picking up a cell phone or whether she unplugged the laptop computers from their power cords. She said that she did not see or take the victim's passport or wallet. She stated that she looked for Ms. Syres when she returned to the van but that Ms. Syres was not there. Ms. Bukowski said that the Defendant had a handgun, that she did not know very much about guns, and that she had never seen the gun previously. Ms. Bukowski did not remember her statement to police that the gun was a plastic toy gun. She said that she did not know whether the gun was a toy. Ms. Bukowski said that she had previously engaged in criminal behavior, including theft. She acknowledged that she volunteered to assist the police when she was arrested. On redirect examination, Ms. Bukowski testified that the police told her during her interview that they might not arrest her if she helped them and that she wanted consideration for her testimony.

Sarah Syres testified that she had pending an aggravated robbery charge and that she signed an immunity agreement on July 10, 2013. A copy of the agreement, which was identical to the one signed by Ms. Bukowski, was received into evidence.

Ms. Syres testified that a few days prior to the robbery, she was working as a prostitute when she met the victim at his apartment complex. She said that the victim told her he had never "been with" an American woman and that they discussed meeting in the victim's friend's apartment. She stated that they went to the apartment, that she was paid, and that after their business was concluded, she called Ms. Bukowski for a ride. Ms. Syres said she made and ate a salad at the apartment while waiting for Ms. Bukowski.

Ms. Syres testified that two or three days later, the victim's roommate, with whom she was acquainted, picked her up and that they went to the victim's apartment, where the victim was present. As she left the apartment, she asked the victim if he had any money, and the victim told her he had $100. Ms. Syres told the victim to obtain smaller bills and that she would return in an hour. Ms. Syres said the victim's roommate took her to another apartment complex, where she bought cocaine and saw Ms. Bukowski and the Defendant. Ms. Syres stated that she asked Ms. Bukowski and the Defendant to take her to the victim's apartment complex and that when they arrived, the Defendant insisted Ms. Bukowski accompany Ms. Syres. Ms. Syres said that the victim was on his apartment balcony and waved at her. Ms. Syres stated that she did not want to bring an uninvited person to the victim's apartment but that Ms. Bukowski followed her to the victim's door.

Ms. Syres testified that she entered the apartment, that Ms. Bukowski remained outside, that the victim said he did not have change, and that Ms. Syres said she would come back later. Ms. Syres said that she asked the victim for a cigarette, that the victim walked away, and that she left the apartment. Ms. Syres stated that when she left the apartment, she heard someone coming up the stairs and saw the Defendant come into the hallway holding a gun. Ms. Syres said that she had seen a plastic gun in the van previously but that she did not know if the Defendant was holding the same gun. Ms. Syres stated that she told the Defendant, "[D]on't do this to me," that the Defendant told her to get out of the way, and that Ms. Syres left.

Ms. Syres testified that she tried calling Ms. Bukowski's and the Defendant's cell phones but that neither of them answered. Ms. Syres said she did not return to the van. Ms. Syres went to the apartment complex where she originally encountered Ms. Bukowski in the hope that they would return there, but she did not see them. Ms. Syres stated that she went to Ms. Bukowski's home and did not know what happened at the victim's apartment until she was arrested.

-7-

On cross-examination, Ms. Syres testified that she understood the immunity agreement to mean that she would not be prosecuted for additional charges arising from information in her testimony. She said that on May 16, she and the victim discussed the particulars of their transaction before going to the victim's friend's apartment, that the victim paid in advance, and that the victim understood they were not dating. Ms. Syres stated that when the Defendant and Ms. Bukowski picked her up on May 17, the victim's having $100 was discussed. Ms. Syres said Ms. Bukowski appeared intoxicated that day. Ms. Syres stated that she told the police she saw a toy gun the size of a person's hand in the van days before the robbery but that she did not see ammunition or a real gun in the van. Ms. Syres clarified that she did not see the toy gun the day of the robbery.

Ms. Syres testified that Ms. Bukowski "pretty much went along with" the Defendant's demand to accompany Ms. Syres to the victim's apartment. Ms. Syres did not remember telling the police that Ms. Bukowski insisted on coming with her. Ms. Syres said that her conversation with the victim prior to the robbery lasted three to five minutes. She stated that she had walked halfway down the hallway when she met the Defendant, that the door to the victim's apartment was closed but not locked, and that Ms. Bukowski remained in front of the closed door.

Ms. Syres testified that she and Ms. Bukowski were housed together at the jail and that they had discussed the robbery. Ms. Syres said that she bought and used cocaine on May 17 prior to the robbery. She stated that she was upset by the robbery but agreed that she did not call the police because she was high and had been working as a prostitute.

Metro Nashville Police Investigator Lynnette Mace testified that she collected fingerprints from a pack of cigarettes and a laptop computer power cord located inside the victim's apartment. She said that she also collected fingerprints from a white Dodge Grand Caravan located on Tampa Drive.

Linda Wilson, an expert in latent fingerprint examination, testified that she identified Ms. Bukowski's left palm print taken from the right front fender of the van, Ms. Syres's fingerprints taken from the front right door, and the Defendant's fingerprints taken from the laptop computer's power cord in the victim's apartment and from the van's driver's side and passenger side doors.

Upon this evidence, the Defendant was convicted of aggravated robbery. The trial court sentenced the Defendant to fourteen years in confinement. This appeal followed.

## I. Sufficiency of the Evidence

The Defendant contends the evidence is insufficient to establish the theft element of aggravated robbery, arguing that there was conflicting testimony relative to whether a theft occurred. The State responds that the testimony and forensic evidence are sufficient to support the conviction. We agree the evidence is sufficient.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401 (2014). Theft of property occurs when "with intent to deprive the owner of property, [a] person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103(a) (2014). Aggravated robbery, in relevant part, occurs where a robbery is accomplished with "a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. § 39-13-402.

In the light most favorable to the State, the record reflects that the Defendant pushed his way into the victim's apartment while holding what the victim believed was a pistol. The Defendant pushed the victim onto a couch and held the victim down, placed the gun to the victim's head, demanded drugs and money, and instructed Ms. Bukowski to take two laptop computers. Ms. Bukowski took the computers. While the Defendant had the gun placed to the victim's head, the Defendant took a pack of cigarettes and the victim's wallet from the victim's pocket. The Defendant took $100 from the victim's wallet. Witness testimony reflects that the Defendant knew the victim had $100 just before the incident occurred, and the Defendant's fingerprint was found on the power cord for one of the stolen laptop computers. The Defendant drove the van

with Ms. Bukowski and the computers to another apartment complex and took the computers out of the van.

Although the testimony of Ms. Syres, Ms. Bukowski, and the victim varied on some details, the jury by its verdict resolved any conflicts in favor of the State, and we may not revisit matters of witness credibility. The evidence was sufficient to support the Defendant's conviction, and he is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE